1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3     Case No. 13-mj-01133-KMT

4     ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

5     UNITED STATES OF AMERICA,

6          Plaintiff,

7     vs.

8     MICHAEL VANNEK KIM MISIEWICZ,

9          Defendant.

10    ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

11           Proceedings before KATHLEEN M. TAFOYA, United

12    States Magistrate Judge, United States District Court for

13    the District of Colorado, commencing at 11:37 a.m.,

14    September 19, 2013, in the U.S. Courthouse, Denver, CO.

15    ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

16           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18    ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

19                        APPEARANCES

20           MARTHA PALUCH, Assistant United States Attorney,

21    appearing for the government.

22           EDWARD HARRIS, Assistant Federal Public Defender,

23    appearing for the defendant.

24    ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

25              PRELIMINARY/IDENTITY/DETENTION HEARING

2

```
1                  P R O C E E D I N G S
2              (Whereupon, the within electronically recorded
3      proceedings are herein transcribed, pursuant to order of
4      counsel.)
5              THE CLERK: All rise.  Court is in session.
6              THE COURT: Good morning, everyone.   Please be
7      seated.
8              Okay.  We are here this morning in 13-mj-1133, the
9      United  States  of  America  versus  Michael  Vannek  Kim
10     Misiewicz.
11             MS.  PALUCH:  Good  morning,  Your  Honor,  Martha
12     Paluch appearing on behalf of the United States.  With me at
13     counsel table is Special Agent Mark Mayeda.  He is with the
14     Defense Criminal Investigative Service.
15             THE COURT: All right.  Could you spell the last
16     name?
17             SPECIAL AGENT MAYEDA: M-A-Y-E-D-A.
18             THE COURT: Mayeda.  All right.  Thank you.
19             And for defendant?
20             MR. HARRIS: Your Honor, Edward Harris appearing
21     with Mr. Misiewicz.  He is present seated -- standing next
22     to me in custody.
23             THE COURT: All right.  Good morning to all of you.
24             We're here today for hearings on a matter that
25     originates out of the Southern District of California, so
```

3

1    that means we're here for -- and it's on a Complaint.  So my

2    understanding is we're set today for a preliminary hearing,

3    an identity hearing, and a detention hearing.   Is that

4    right?

5         MR. HARRIS: We are, Your Honor.  I have tendered

6    to the Court sort of a modified waiver of some of that,

7    specifically the intention of the waiver is that he's

8    waiving here the preliminary and identity hearings,

9    reserving them to San Diego, Southern District of

10   California, but today wishing to address detention here.

11        And I can just, as a heads-up on detention,

12   advise you that we are seeking release.  I know that's

13   different than the Pretrial Services Report, and I think we

14   have some substantial points of agreement with the

15   government on conditions of release and one point of

16   disagreement which we'll address.

17        THE COURT: All right.  Well, first of all, let me

18   address the waiver of the identity hearing and the

19   preliminary hearing, and the request that those hearings be

20   held in the prosecuting district.  Mr. Misiewicz, I want you

21   to understand that you do have the right to have those

22   hearings here in Colorado if you want to have them.  The

23   identity hearing, if you don't have it here, you won't ever

24   have one.  You'll -- you'll just go back to California with

25   that, but the preliminary hearing, you can reserve your

4

1    right to have that in California and have counsel there.  Do

2    you understand that, and is that your desire today?

3              THE DEFENDANT:  Yes, Judge, I understand that.

4    With respect to the identity hearing, it's -- it doesn't --

5    I mean, it could be -- go either way.  I talked to my lawyer

6    just before this, and I don't think there's any mystery that

7    the person in the Complaint is me.

8              THE COURT:  Okay.  And that's the main purpose of

9    an identity hearing, just to make sure that the police

10   haven't arrested the wrong person, you know, with the same

11   name or something.  So I will approve the waiver of those

12   two hearings in this district, with preservation of the

13   preliminary hearing right in California, and we'll just take

14   up the issue of bond.

15             I do want to make a statement, however.  I need to

16   advise everyone that I -- I misread the defendant's

17   financial affidavit when I first got it, and I thought it

18   said a thousand a month.  I remember asking you if you were

19   in the active Armed Services, and I just looked at it too

20   briefly, and so I do want to tell you -- the reason I'm

21   bringing this up now, I'm not going to change your

22   representation here, I think it's important for you to go

23   forward with the attorney you have, but I don't think you'll

24   get appointed counsel in California, and so that's why I'm

25   bringing it up.  I don't think you really qualify for

5

1    appointed counsel given your income and your assets, but I'm
2    going to keep the appointment here.  I think it's in the
3    interest of justice to go forward with the attorney that
4    I've already assigned you, I just don't want you to be
5    surprised in California if they -- the judge there says no,
6    you have to retain your own attorney.  All right?
7                THE DEFENDANT: Okay.  Thank you, Judge.
8                THE COURT: All right.  So we'll go forward today.
9    How does -- how is the government preparing to proceed on
10   the issue of detention?
11               MS. PALUCH: Thank you, Your Honor.
12               First of all, I would like to state for the record
13   that I have been in contact with Main Justice, as well as
14   the United States Attorney's Office for the Southern
15   District of California, who is prosecuting this case, and I
16   am representing what the prosecutors on both sides of the
17   coast have represented to me as their desires on this case
18   of what we do here.
19               It is the government's position that a bond is
20   appropriate in this case with the following conditions:
21   First, that the defendant be required to post a $50,000
22   secured cash bond or a $50,000 property bond, that the
23   defendant surrender all passports, that the defendant not
24   possess any firearms, and that he be subjected to GPS
25   monitoring at all times.

6

1          The basis for the government's request for these

2     conditions is as follows:  We believe that the -- that the

3     defendant does pose a flight of risk (sic) for these

4     reasons.  The defendant has a permanent visa to Cambodia,

5     has traveled to Cambodia, most recently in December of 2011

6     along with five members of his immediate family, in part, to

7     attend a relative's wedding in Cambodia.  That trip was

8     financed by his co-defendant, Leonard Francis.  While the

9     defendant has ties, family ties to Cambodia, he has none to

10    Colorado.  He has only been in Colorado since January of

11    2013, of this year.  His immediate family, his wife and four

12    children, live in Illinois, but the defendant and his wife

13    are going through a divorce, and the defendant has had

14    limited contact with his family in Illinois.  To my

15    knowledge, he has no family in San Diego where he is wanted

16    on the instant Complaint.

17         Through his time in the Navy, the defendant has

18    traveled extensively.  When his resident was -- residence

19    was searched, as is noted in the Pretrial Services Report,

20    currency from eight different Asian countries was found

21    under his bed.  Through the charged conspiracy, the

22    defendant established a close relationship with the

23    defendant Leonard Francis, to include referring to himself

24    as "little brother" and Mr. Francis as "big brother."  As

25    noted, his recent trip to Cambodia was financed by Mr.

7

1    Francis is what the evidence reveals, as well as many

2    numerous trips to other countries by this defendant that

3    were financed by Mr. Francis.

4         Our investigation has revealed that Mr. Francis is

5    a very wealthy man, a man with substantial means, and our

6    information is that he frequently travels by jet.  And while

7    we may be in -- while we believe the defendant may think

8    it's in his best interest to leave this country and avoid

9    these charges, it may be also in Mr. Francis's interest that

10   this defendant leave the country, and Mr. Francis has the

11   means to make that happen.

12        Now, given the financial information we have

13   uncovered in the last few days, as the -- it does appear

14   from the Pretrial Services Report as well that the defendant

15   was not completely truthful in his financial affidavit.  We

16   have learned of multiple investment accounts, pieces of

17   property.  In fact, four pieces of property owned by the

18   defendant.  These were not disclosed on that report, and I

19   believe his lack of candor certainly is something that the

20   Court may take into consideration.

21        Now, I have spoken to the commander at the

22   Northern Command in Colorado Springs as to what would occur

23   should this Court decide to grant bond in this case, and I

24   have been advised that if released the defendant would be

25   escorted to Colorado Springs, that his security clearance

8

1    currently has been suspended, that he no longer has access

2    to the Northern Command Center, that he will be detailed to

3    Fort Carson until arrangements can be made for the defendant

4    to receive duty, temporary duty in San Diego pending his

5    currently scheduled September 30th, 2013 at 2 p.m. court

6    date in San Diego.  I would note for the record that the

7    military will not be providing that transportation.  If the

8    defendant's released on bond, it will be his burden to get

9    himself to San Diego.

10           In light of these concerns, we believe that the

11   conditions we propose would subject this defendant to the

12   least restrictive conditions that will reasonably assure his

13   appearance at his next court date in San Diego and assure

14   the safety of any other persons in the community.

15           Thank you, Your Honor.

16           THE COURT: Let me ask you before you sit down.  If

17   -- if you're concerned about the close relationship with Mr.

18   Francis and the amount of money that Mr. Francis has to

19   finance travel, how do you think $50,000 -- that seems like

20   kind of a drop in the bucket.  Why is that enough?

21           MS. PALUCH: Right.  I mean, that is a good point,

22   and I had spoken to the other prosecutors and they felt that

23   the 50,000 secured -- meaning that he would have to come up

24   with the 50,00 in cash.  Your Honor makes a good point that

25   Mr. Francis could easily make arrangements to get that money

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1    to him.  I don't have any information other than what I've

2    stated now.  It's very likely that 50,000 is not enough to

3    ensure this defendant's appearance, and we are hoping that

4    through the GPS monitoring that we will know his

5    whereabouts.

6         THE COURT: I understand there's a problem with GPS

7    monitoring in this case.

8         PRETRIAL SERVICES OFFICER: Initially we thought

9    there might be, but given the fact that the defendant is

10   living off base, it would no longer be a problem.  The

11   defendant's work schedule would probably an 8-to-5 or

12   daytime hours to where we would have access to the base and

13   security and we could probably get in if we needed to, so I

14   don't think that will be a problem at this time.

15        What I was going to advise the Court, if the --

16   if you are inclined to release on bond, we would suggest a

17   $100,000 bond secured; 50,000 cash and 50,000 in property.

18        THE COURT: All right.

19        MS. PALUCH: And I would just point, too, Your

20   Honor, as the Pretrial Service Office Report indicates, the

21   assets that the defendant has, our agent is here, he also

22   has documentary evidence as to the most current balances in

23   some of these investment accounts that we're talking about,

24   so it's our position that the defendant does have access to

25   the funds to make whatever bond is set by the Court.  If you

1    would not like to make that bond, the marshals then -- and

2    he is detained, the marshals would be transporting him, and

3    I have talked to the marshals as to whether they could get

4    him there in time for the September 30th date, and they

5    indicated that would be unlikely.  But as you and I know,

6    court appearances are rescheduled often, and so if

7    California has to wait a few more days for the defendant's

8    appearance, they certainly could.

9         But just so I'm not talking out of both sides, it

10    is the government's recommendation, as I've stated, the

11    50,000 secured with the conditions that I've set -- set

12    forth.

13         THE COURT: All right.  And his -- his next court

14    appearance date in San Diego is September 30?

15         MS. PALUCH: 30th at 2 p.m.

16         Thank you, Your Honor.

17         MR. HARRIS: Your Honor, before I proceed, could I

18    just take a look in the court file at the financial

19    affidavit?

20         THE COURT: Do you -- can you print him one?  I

21    have writing on mine, so I'd rather not give you mine.

22              (Pause in the proceedings)

23         MR. HARRIS: Your Honor, first, I guess, I'd like

24    to address the financial affidavit and primarily the

25    question of whether or not there's been any deliberate

1    attempt by Mr. Misiewicz to hide or not disclose assets,

2    because that's one thing that Probation mentions, and it was

3    referred, I think, in passing, too, by Ms. Paluch.

4         You know, as I read the affidavit, there's a

5    section under "assets" that says "property," and it says do

6    you own any real estate, stocks, bonds, notes, automobiles

7    or other valuable property, and he did check off "yes," and

8    he listed the various homes and cars and listed some stocks.

9    What is not listed there that might be more directly

10   relevant is some mutual funds jointly held that are listed

11   in the report that were provided to Probation by the

12   government, and that's about 118,000 or so, as well as some

13   retirement funds that are much less liquid than that.

14        I would say that, you know, a fair reading of what

15   that says, under the conditions of under which it is signed

16   when someone is in jail, never been in jail before, quickly

17   looking at this, jotting things down into the limited space

18   available, is that he's listing things that he recalls at

19   that point, he's not making an attempt really to hide the

20   assets.

21        The other thing I would note about it is that all

22   of the assets are jointly held and he's in the midst of this

23   divorce, so how much of it he will be able to access at all

24   remains sort of speculative. Having said that, you know, in

25   terms of what it appears he actually has in assets, the

1    various homes are, as he puts it, underwater.  The vehicles

2    don't amount to much.  The TSP is not, as Your Honor

3    probably knows, easily accessed, and I would suspect much

4    less so even from jail.  Ditto the Roth or any other

5    retirement sheltered sort of funds.  I mean, really what's

6    available, to the extent that it is, primarily is that

7    118,000 or so in the joint mutual fund.

8        Again, he would probably need to arrange this

9    through his wife, and it is a divorce, but it's --

10   apparently they're not at it hammer-and-tongs, so it's not

11   War of the Roses and he might be able to get some

12   cooperation there, but probably not to the tune of

13   liquidating that, especially in the event that he's going to

14   perhaps have to hire counsel, although I suppose if he

15   liquidated it in San Diego a magistrate judge or district

16   judge will reassess whether the Fed Defenders there remain

17   or become appointed on the case.  I guess my point, though,

18   as to all that is he doesn't have that much available

19   relative to its accessibility and his ability to put it

20   towards bond.

21       So I think if there's to be a secured bond that

22   50,000 is adequate and more than reasonable.  We believe

23   that there's not a need for a secured bond, and I'll address

24   that now.  But, first, in doing that, I'll address the

25   points that Ms. Paluch has raised specifically.

1          First, with respect to his ability to travel to
2   Cambodia or elsewhere, it is certainly true, he has traveled
3   fairly extensively, but he -- he would surrender his
4   passport, and regardless then of any visa that he may have,
5   I'm not sure how -- at least on commercial air -- he'd be
6   able to get anywhere from point A to point B without that
7   passport outside of the United States.

8          Now, with respect to private jets, or whatever,
9   and I guess that's the implication is that Mr. Francis or
10  others have substantial means and would somehow ferry him
11  out of the country, all I can say is that I think it's a bit
12  speculative to suggest either that Mr. Francis can or will
13  do that.  There's no way to really show that he would be
14  able or would act on aiding him in that manner and, as a
15  result, I don't know how much weight can necessarily be put
16  on that.

17         He does, with respect to family ties, have family
18  ties in the U.S., in Illinois.  He doesn't concededly have
19  family ties in either the originating district or here, but
20  he does have obviously other ties that keep him here,
21  including his wife, including their children, including his
22  Naval duty and the fact that he's assigned to Northern
23  Command at this point, and may or may not get reassigned to
24  San Diego or elsewhere, but, I mean, he's on orders, at
25  least as long as this is pending, until resolution, if it

1   resolves unfavorably and, you know, he's not really going

2   anywhere as a result of that.   Notwithstanding the

3   allegations, which, of course, just remain that, allegations

4   in this case.   I mean, he's had a pretty distinguished

5   career in the Navy serving the United States, and he has

6   those ties clearly grounding him to the United States, and

7   I think all of that also speaks to other factors, and

8   generally both to his nonappearance risk or danger.   I mean,

9   he's never failed to be employed, he's never failed to carry

10  out duties in connection with his job or service to the

11  country, and, you know, I think overall given -- given

12  everything is not terribly unlikely to appear.

13        As far as danger goes, I don't know that the

14  government is really arguing that he's a danger or that

15  there's a need to mitigate the danger.   I know Probation is

16  -- and simply states the nature of the offense, alleging

17  conspiracy to commit bribery.   You know -- I mean, I suppose

18  there's a public safety aspect at some level to any criminal

19  charge, but this one falls to a much lower level relative to

20  some of the things that come before the Court in terms of

21  just pure public safety.

22        So I guess the question becomes, then, how does

23  one best ensure that he appears and that the public isn't

24  endangered, and is it possible to do that short of keeping

25  him in jail.   And I would agree with the government that a

15

1    $50,000 bond would do that, but I just think that a less

2    restrictive alternative involving GPS, involving whatever

3    other pretrial supervision might be imposed is possible, and

4    given that I believe it to be possible, I would urge the

5    Court, then, under the Bail Reform Act to impose that.

6         The problem is that if he's got like 120,000 or so

7    in that joint account, and that's basically what's

8    available, that even if he's able to somehow work this

9    through his wife or others to get at it and use the 50,000,

10   I mean, it doesn't leave -- I mean, that pretty much eats

11   his share of it, you know.  I mean, there's going to be a

12   divorce, there's going to be QDRO, or whatever equivalent in

13   the state the divorce is filed, and, you know, that's what's

14   available, but it's really sort of at the limits of what's

15   available.

16        Thank you.

17        THE COURT: Well, this case is rather unique in

18   this Court's experience, because many of the things that we

19   look at to assess whether or not someone is eligible for

20   bond really are not present here.  This defendant has had a

21   distinguished career prior to this case, and he doesn't have

22   any criminal history, which, of course, doesn't surprise me

23   a bit, and the real key here, I agree at this point, is not

24   really public safety, because the Navy now is aware of these

25   charges and apparently has removed his access to cause our

1    ships and et cetera to be in jeopardy, and so I think that

2    danger, while I don't in any way, shape or form minimize it,

3    I think it's been ameliorated at this point because they now

4    know, so he doesn't have access to what he had access to

5    before.

6          So the real key is whether or not there's a chance

7    that he'll flee, and I think there's a pretty big chance,

8    but the problem is that I have to agree with defense counsel

9    that just having close ties with a co-defendant who's

10   extremely wealthy without more is not enough to make me not

11   allow him bond.  I'm worried about that, very worried, but

12   I think there are some conditions that can be imposed that

13   would help temper that.  There's always a risk when you

14   allow anyone out on bond that they'll flee, but I think we

15   have to -- there are conditions that we could take that will

16   reassure me somewhat, and then I'm also reassured by the

17   fact that he's still on active duty in the Navy, and

18   therefore the Navy, his commanders, et cetera, have some

19   control over him, so I don't know how much, but I'm assuming

20   it's more than you would have in a normal employee

21   relationship.

22         So I think there are some conditions.  Having

23   heard from Probation now that GPS monitoring is available,

24   that is definitely going to be one of the conditions of

25   bond, I want him on GPS monitoring.  And, Mr. Misiewicz,

1    what that means is you wear an ankle bracelet, or something
2    like that, and we'll know where you are at all times.   So
3    you won't be able to get much of a head start, so it's a
4    form of lack of trust, but you may have earned that with
5    these charges.   On the other hand, I think it's certainly
6    worth letting you try it and prove us wrong that you are
7    going to stand up and be responsible about this.

8          I'm also persuaded frankly because we are here in
9    Colorado, we're kind of a stopping point in the road here,
10   don't have much to do with this case, and if the prosecutors
11   and other people in California are recommending a bond,
12   that's persuasive to me, it is their case.   I might view
13   this differently if it was a Colorado case, but it's not,
14   and I recognize that you don't have any ties here in
15   Colorado anymore with your family having moved to Illinois.

16         I'm -- I'm not persuaded by the -- that you're
17   hiding assets necessarily based on the financial affidavit.
18   As I said, I misread it, but that's not your fault.   It
19   shows here that he has three homes, he lists the address, he
20   talks about his cars.   He says TDAmeritrade, he says -- I
21   don't know what Keiman (phonetic) is, but there's stocks
22   listed here.   There's just not much room to give a really
23   thorough expose' on someone who has some significant assets.
24   I do see that he's got some significant liabilities, too.
25   I don't think all of the homes are underwater, it looks like

1    the one in San Diego might have about 20,000 in equity, if

2    these numbers are correct, and the one in Austin has about

3    40,000.  The Maryland house looks like it's underwater, and

4    the Illinois residence, to the extent that that's even

5    attributable to this defendant, I'm assuming that's the

6    wife's house, it doesn't seem to have any equity in it.

7            So looking at the factors, all this is is a way

8    of saying that looking at the factors of the Bail Reform

9    Act, that I go through pretty frequently, the nature and

10   circumstances of the offense charged, the weight of the

11   evidence against the person, the history and characteristics

12   of the person, and the nature and seriousness of the danger

13   to a person, I am going to find that this defendant is

14   eligible for bond under conditions, primarily based on

15   number three, the history and characteristics of the person,

16   as well as one that's not listed, as I said, the

17   recommendation of the charging district, the prosecutors in

18   the charging district.

19           I don't think 50,000 is enough, though, so I am

20   going to require that this be a secured bond in the amount

21   of $100,000.  To the extent that any part of that $100,000

22   is in cash, secured by cash rather than property, I'm going

23   to want proof of where the cash came from.  So if he's

24   taking cash from his joint mutual fund, I want to see the

25   withdrawal of that before I approve it.  And my concern is

19

 1    obviously that Mr. Francis not put up any of the cash, so I
 2    won't pretend that that's not what I'm looking for there.
 3    But I -- but you can secure it by cash or property in any
 4    percentage that you want.  So if there's some that you can
 5    use property, that's fine, and if there's -- the remainder
 6    you want to do cash, that's fine, as long as you establish
 7    that the cash is coming from a legitimate source.

 8         I am going to agree that you will have to turn in
 9    your passport, any kind of travel documents, and then you
10    cannot get another passport, so don't write and say you lost
11    your passport or something.  No travel documents.  I am
12    going to restrict your travel to Colorado and the Southern
13    District of California, so if you're driving and you have to
14    pass through Utah, that's all right, as long as you're on
15    the way to a hearing or something in California.

16         And then, like I said, we'll do the GPS
17    monitoring.  Now, you are going to be restricted from
18    firearms, and I note that you're living with other people
19    who are in the Navy, so they may have firearms there that
20    are legitimately theirs, but you can't be in a house with
21    firearms, so they have to agree to take their firearms
22    somewhere else or you have to live somewhere else.

23         THE DEFENDANT:  Judge, I don't believe -- one,
24    they're not in the Navy, and no one in the house that I know
25    has firearms.  They're all retired elderly people.

1          THE COURT: Oh, all right.  I think I -- I thought

2     I saw in the report that they were Navy personnel, they're

3     not, though?

4          THE DEFENDANT: No, Judge, they're not.

5          THE COURT:  All right.  So no one can have

6     firearms, and that's kind of a penalty to them.  Maybe it

7     isn't, if they don't have any, but you can't have any in the

8     house where you are.  And when you move to California, you

9     still can't have any, so no firearms in the house.  I'll

10    leave it up to the Navy to control your access to firearms

11    on the base, that's more of their purview, but you're

12    prohibited from doing anything with firearms, so you need to

13    tell your superiors that if they're -- some of them are

14    probably here, but to the extent they're not, if they want

15    you to do something involving firearms of any kind,

16    explosive devices, you can't do it.  All right?

17         THE DEFENDANT: I'll make that known, Judge.

18         THE COURT: All right.

19         THE DEFENDANT:  I've never possessed or owned

20    outside of the military a firearm.

21         THE COURT: All right.  Does that kind of take care

22    of most of them?  Let's -- do you want to give me some

23    conditions and --

24         PRETRIAL SERVICES OFFICER: Yes, Your Honor, I

25    didn't know if you wanted to include -- and this is probably

1   a silly question given his position in the military.  Given

2   that California and Colorado are marijuana states that allow

3   it, do you want to include that, just to put that or not,

4   and you want to take that out?

5         THE COURT: That's a standard condition, so put

6   that in.  I don't think there's any reason to test, but what

7   the probation officer's talking about is our standard

8   conditions are that you not possess, use, any narcotic

9   substances unless prescribed by a doctor.  That becomes

10  tricky here in Colorado because doctors sometimes prescribe

11  marijuana, but marijuana is still a controlled substance in

12  the federal system, so to the extent that that has anything

13  to do with you, a doctor's prescription isn't good enough.

14  You cannot use marijuana of any kind, for any reason, all

15  right?

16        THE DEFENDANT: Yes, Judge, I've never used drugs

17  in my life, and we get tested regularly in the military.

18        THE COURT: All right.  So we'll put that as a

19  condition, but I'm not going to put as a condition that you

20  be tested for it, because I don't think that's really your

21  issue, but that's what she's talking about.  So that's one

22  of the standard conditions.

23        So do you have the bond conditions there?  Let me

24  just go through it, and I'll -- I'll tell you what the

25  conditions are.  Now, we're not going to be able to do bond

22

1     today, because you are going to have to post the security

2     for the bond, all right, so I'm not going to have you sign

3     this today or anything, because we'll do that when the

4     security is actually before the Court, all right, and it'll

5     have to be approved by the Court.  But it's a secured bond

6     in the amount of $100,000, cash or property, and the phrase

7     here says "cash or property with proof of withdrawal from

8     defendant's assets or other legitimate source."

9           And then the other conditions that are checked are

10    standard, let me just go through them with you, and then

11    we'll do this again before you have to sign, but you're

12    going to have to submit to supervision by and report for

13    supervision to the U.S. Probation Office in Colorado

14    Springs.  The address is on this bond paperwork, it's

15    actually 212 North Wahsatch Avenue, and there's a phone

16    number, so -- to direct you where that is.

17          You have to continue or actively seek employment,

18    that's standard.  I expect that you'll still be in the Navy.

19    Surrender any passport.  Do you have a passport from any

20    other country?

21          THE DEFENDANT: No, I just have a single tourist

22    passport.

23          THE COURT: For -- United States' passport?

24          THE DEFENDANT: Yes, Judge.

25          THE COURT: All right.  So you'll need to surrender

1   that to the clerk's office within 48 business days of your

2   getting out on bond.  Now, one way to do that is to do it

3   ahead of time, if you have someone who can get it and bring

4   it down to the court you can do that ahead of time, and then

5   everything's done when we actually prepare the paperwork.

6          You can't obtain a passport or other international

7   travel document.  Your travel is restricted to Colorado and

8   California for court purposes.  You must avoid all contact,

9   directly or indirectly, with any person who is or may be a

10  victim or witness in the investigation or prosecution,

11  including your co-defendants.  Now, that means the person

12  I'm worried about with the money.  You can't have any

13  contact with him.  Are you clear on that?

14         THE DEFENDANT: I am, Judge.

15         THE COURT: All right.  Because your phone records

16  and that sort of thing will show that, so no contact with --

17  it's Mr. Francis, right?

18         THE DEFENDANT: Yes, Judge.

19         THE COURT: All right.  So no contact with him

20  while you're on bond.

21         You may not possess a firearm, destructive device,

22  or other weapon.  You may not use alcohol excessively.  That

23  means, you know, don't get a DUI, but you -- I'm not telling

24  you can't have a beer if you want to have one.  You may not

25  use or unlawfully possess any narcotic drug or other

24

1    controlled substances absent a prescription by a licensed

2    medical practitioner, that's what we were just talking

3    about.  You'll participate in a program of home detention

4    where you're restricted to your residence at all times

5    unless you have permission from your probation officer.

6           Now, you will get permission, of course, for court

7    appearances, attorney visits, you know, that sort of thing,

8    but you have to get permission.  It will be GPS monitoring,

9    which is absolute location monitoring.  You must pay for all

10   or part of the cost of the program based on your ability to

11   pay, and you'll report as soon as possible to the Pretrial

12   Services Office or supervising officer any contact with law

13   enforcement personnel.  Now, I -- you know, obviously

14   there's  security people in the Navy, but I'm really talking

15   about, you know, if a police officer stops you on the street

16   you need to report that.  If you're arrested for any reason,

17   you have to report that.  And you'll not act as an informant

18   for any law enforcement agency without prior permission from

19   the Court.

20          Now, the other thing I need to tell you is, of

21   course, the most important thing about bond is -- what we're

22   trying to do is ensure that you show up for court, that's --

23   that's obviously the key.  So you must make all your court

24   appearances in California or your bond could be revoked.  If

25   you don't make your court appearances, you could get charged

25

1    with bond jumping, and that carries a penalty of up to ten

2    years in prison, a $250,000 fine, or both, and it would

3    probably be levied on top of anything else if you were

4    convicted of something in this case.  Do you understand

5    that?

6            THE DEFENDANT: I understand, Judge.

7            THE COURT: All right.  And you can't get into any

8    trouble while you're on bond, I don't think that should be

9    a problem for you.  Obviously you're not going to get in

10   trouble very often, so those are the conditions of the bond.

11           Let me talk to the attorneys, though, now about

12   what to do now.  My general practice is to issue the order

13   to the marshals to transport and not hang around waiting for

14   someone to post the bond.  That said, you know, somebody

15   could stay here for a couple of weeks and have plenty of

16   time.  Or, the marshals could take him tomorrow, then he

17   wouldn't have enough time.  So do you want to speak to that?

18           I don't want to delay his going to California, I'm

19   sure he doesn't either, but I also don't want to pull the

20   rug out from under a bond if he wants to make it.

21           MS. PALUCH: Right.  Well, I guess I'm a little

22   confused, Your Honor.  I'm understanding he has to stay in

23   custody until he can post the bond --

24           THE COURT: Right.

25           MS. PALUCH: -- the amount.

26

1           THE COURT: That's right.

2           MS. PALUCH: And so what we're -- our concern here

3    is whether or not he's going to make that -- that court

4    date.  Is that correct?

5           THE COURT: Right.  Well, if he posts the bond and

6    everything is done in two days, then he'll probably make the

7    court date.

8           MS. PALUCH: Right.

9           THE COURT: If he doesn't, then he's probably not

10   going to make that court date --

11          MS. PALUCH: Right.

12          THE COURT: -- because the marshals tell you that

13   they're probably not going to get him there in time.

14          MR. PALUCH: Right.  Right.  So as soon as he posts

15   the bond, then it'll be his responsibility to get himself to

16   California.  If he's still in custody and we're getting

17   close to that September 30th date, I don't know if I'd be

18   able to receive notice of that from Pretrial Services or

19   what, and I could make the calls out to California that they

20   need to reschedule that so it's not shown that he's failed

21   to appear for that.

22          THE COURT: Right.

23          MS. PALUCH: I don't know if I've addressed the

24   Court's concern, though.

25          THE COURT: Well, my main concern is, do you care

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1    -- and, Mr. Harris, this is more your issue.  Do you want me

2    to hold off for a certain amount of time issuing the order

3    directing his transport to Southern California?

4              MR. HARRIS: Yeah, I think that's probably a good

5    idea.  Maybe also to set it for a status conference a couple

6    of days or a week or so out.

7              If I could have a moment, he's indicated that one

8    of the people here is his first command, and could I talk to

9    that person for a minute?

10             THE COURT: Yes.

11             (Pause in the proceedings)

12             MR. HARRIS: Your Honor, having talked to my client

13   and others, I've actually rethought my position on it, and

14   I think we should just go ahead and leave things as they

15   normally would be.  I can -- if something happens, I can

16   contact the Court and we can see if there's anything to be

17   done, but he thinks that probably in the next couple of days

18   he should be able -- if he's going to be able -- to access

19   the mutual fund which is where the source of funds would be,

20   that he's going to know, and he's either going to be able to

21   do it or not do it.  So I think, you know, he's unlikely to

22   be gone in that short of period of time.

23             THE COURT: Well, I think it's unlikely, but if I

24   sign the commitment to another district, can any of you

25   marshals speak to that?  If the plane is coming through

1    tomorrow, he's on it, right, if there's a spot for him?

2              U.S. MARSHAL: If the paperwork's submitted and

3    he's on the flight, or the flight list, then he'll be gone

4    tomorrow.  I mean -- but it's just a -- it's really a game

5    of give-and-take.  We don't know when it's going to happen.

6    I don't.  The best person that could speak to that issue

7    would be Deputy Holden (phonetic), our supervisory Deputy

8    Holden.

9              THE COURT: All right.  So I'll just issue the

10   commitment to another district the way I would.  We'll note

11   that the appearance date -- and I'm sure the marshals have

12   written this down -- is the 30th of September at 2 p.m. in

13   that district, but they've already said they may not get him

14   there for that.

15             MS. PALUCH: Correct.

16             THE COURT: Although that's -- well, it's not

17   really quite two weeks, it's about ten days from now.  So

18   we'll just leave it as is.  You don't want to set a status

19   conference or anything?

20             MR. HARRIS: I don't think so, Your Honor.  As I

21   understand it -- and I don't always or often deal with a lot

22   of bond posting, as you imagine.   As I understand it, if

23   the bond is posted through the clerk's office, that will

24   trigger whatever events are necessary to get a court date

25   for him to sign the conditions.

1           THE COURT: Right.  But then --

2           MR. HARRIS: Right.

3           THE COURT: -- there's a three-day time period to

4    get the GPS going, right?  Or no?

5           PRETRIAL SERVICES OFFICER: We would probably like

6    to check the house, and I think we can do that within -- by

7    tomorrow or the next day.  But with GPS, we don't need a

8    land line --

9           THE COURT: Okay.

10          PRETRIAL SERVICES OFFICER: -- so that's one good

11    thing that can get done quickly.

12          THE COURT: All right.  So you -- you'll just do

13    that anyway, so if he does post the bond, you're ready to

14    go.

15          PRETRIAL SERVICES OFFICER: Correct.

16          THE COURT: Okay.

17          MR. HARRIS: Okay.

18          PRETRIAL SERVICES OFFICER: And I might suggest to

19    defense counsel possibly looking at the defendant's TSP

20    loan.  Those funds are usually quickly available, you can

21    only take half of what's currently in there.  Defendant,

22    because he is married, would have to get his wife to sign

23    it.  It sounded like when I spoke to her she was willing to

24    do whatever she needed to (inaudible) bond, but that might

25    be an option for defense.

30

1                    THE COURT: All right.

2                    MR. HARRIS: Okay.

3                    THE COURT: Okay.  Well, I'll leave it up to you,

4     then, to work it out.  I'll just issue the commitment.  If

5     -- just so all of you know.  If your bond is posted sometime

6     next week, probably you will have a bond release set before

7     Judge Hegarty, so don't be surprised about that.  I don't

8     see any real reason why you would have to come back here,

9     because nothing is going to change, he'll just read the bond

10    conditions, so, again, the normal practice is you'd go to

11    Judge Hegarty.  Okay?

12                   MR. HARRIS: Okay.

13                   THE COURT: So if it's Monday or Tuesday or

14    something, that's where he'll be.

15                   MR. HARRIS: Okay.

16                   THE COURT: And just be sure you check with the

17    marshals, make sure he's still in town.

18                   MR. HARRIS: Okay.

19                   THE COURT: But my guess is he will be.

20                   MS. PALUCH: Okay.

21                   THE COURT: All right.  Court will be in recess.

22                   THE CLERK: All rise.

23                   (Whereupon, the within hearing was then in

24    conclusion at 12:22 p.m. on September 19, 2013.)

25

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305

31

1            I  certify  that  the  foregoing  is  a  correct

2      transcript, to the best of my knowledge and belief, from the

3      record of proceedings in the above-entitled matter.

4

5

6            /s/ Bonnie Nikolas          June 20, 2014

7      Signature of Transcriber               Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25